# Amended Complaint

(Same Document as Doc. 24, only with new and improved Heading)

*Submission date is now November 29, 2022, nothing is changed below this line

Willie Lee HavMmeri,

Plaintiff

vs.

Methodist Health Systems,

Defendant

Case No. 3:22-cv-00594-E-BT

## Where is my Incident Report?

I find it a both ironic and extreme sad that I would ultimately be FIRED by powerful women in positions of Authority simply for trying to have Gender Discrimination investigated.

## Introduction

Before I start, a disclaimer is necessary.

I, Willie HavMmeri, am not a lawyer nor do I have any expertise in the many facets of employment law. These are extremely difficult times.  I ask the court and Methodist's legal team to please be both patient and understanding of my position during these judicial proceedings. I thank you in advance.

I would also like to ask, once I have secured the services of a competent legal team that I am allowed the discretion to revise, further detail or add upon my claim in its entirety.

**My Complete Case to Present to the Court:**
**What should I, as an employee, have done differently?**

My case is a simple one.  I believe it to be simple to prove and simple to render in judgement.

Upon reading the MHS Legal Team's detailed request for a more definitive statement, I now understand that, legally, my facts must be in order and there are no excuses made or sympathy given for the fact that I am currently representing myself "pro se".

Unfortunately, again, I am no lawyer.  My legal jargon and expertise are quite limited in that regard.  My apologies again for speaking in such laymen terms in the following summation, but here's my case as I personally understand it to be.

> I arrive at work on March 10th 2020 to start my shift at 0800.  A young lady was sitting at my assigned workstation where I am to use my workstation phone to clock in to start my shift.  (See Exhibit 10)  I asked her for my desk to phone in to start my shift (By Policy, this is the only method for me to clock in or out for a work shift).  She refused to allow me my assigned

workstation.  After repeated pleas for my workstation to start my shift, I was cursed out by the young lady, belittled and disrespected much to my dismay.

Knowing this young lady had no legitimate reason to be in my office nor at my workstation (being a third (3) worker in a two (2) person work environment), I was reluctant to speak on the humiliating matter to my Director of Cardiology because the young lady in question was a personal hire of hers and was ultimately in the workplace to serve in an unofficial manner as a "personal assistant" to Said Director.

After a week of contemplation on the matter, I decided on March 17th 2020 to email my Director, detailing my frustration with a long history of personal, perceived instances of workplace violence (examples of female staff cursing me out, belittling and gossiping about me). I detailed in the email that the problem associated with being cursed out on this particular day (March 10th 2020) was not simply that female staffers were allowed to belittle me with no consequence throughout the years but also that this current act was a result of her (the Director) maintaining 3 workers in a 2 person office with only 2 workstations assigned to the 2 full-time staffers (myself being one).

I informed my Director that she herself had also engaged in the toxic, workplace violence and gave her examples of routinely threatening to fire me in front of the very female staffers who belittled me regularly.

I informed my Director in the email that the fear of her terminating my employment and the persistent workplace violence created a toxic workspace for me and had negative effects on my health, as sited in the initial email regarding my blood pressure being at stroke levels due to the anxiety I was facing at my workstation for years.

This is all documented in an email presented as evidence below (Exhibit 1) and is not a point of contention, at least I do not believe.

I informed the Director that because of her close, personal relationship with the female staffer in question who cursed me out on March 10th 2020 and the fact that the young lady had no particular right to be at my workstation nor a defined role hovering around our department for 8 to 12 hours on a given day, that I wanted to speak to her immediate supervisor (VP of Nursing) with my HR Rep present.  I wished to have an investigation opened into my Director's hand in maintaining a 3 person workspace despite their only being 2 workstations.

This was discrimination because I, being the only male in my department, was not allowed to receive these additional hours with no defined role and, at the time of my termination, I worked at 3 different Methodist Hospitals simultaneously to get my allotted full-time hours.

(Methodist Dallas, Methodist Plano & Methodist Charlton)

Female employees were allowed to pick up extra hours as a "personal assistant" to the Director or even help the Department Secretary file paperwork after their shifts ended to get additional hours.  I, being the only male in my immediate department, was not privy to such additional hours.

Deals were made between my Director and another female department Director for one young lady to work 2 days in one department and one day in our department as my Director's "personal assistant" despite the fact that there were no readily available hours for the worker, no workstation for the worker and no defined role as the worker, who worked exclusively in my 2 person workspace causing years of frustrations, which I repeatedly shared with my Director.

(I was a 36 hour per week employee and only had 31 hours per week allotted to me.)

I informed my Director that I had no confidence in her handling of the matter and sited to her that I had informed her of plenty instances where I was belittled, cursed out, humiliated and witnessed female workers effectively stealing time and nothing was ever done about it.

While my Director assured me via email reply that I would be granted an audience with her immediate supervisor with my HR rep present (as I requested), I was instead summoned to HR to meet with an Acting Investigator on April 7th 2020 at the behest of my Director and subsequently fired for stealing time on April 10th 2020 being, again summoned, from home to HR to hear what was to be the conclusion of the investigation into my grievance.

For the record, there is no evidence that I ever had a grievance investigated from MHS. (Siting Policy on Incident Reports)

For the record, my Director was never removed from the work environment while my allegations against her were properly investigated.  (Suspension, pending investigation and review, Exhibit 5).  Because my Director was not suspended and removed from the work environment, she was allowed to dictate and manipulate the direction of the investigation.  My Director personally called me to inform me I was needed in HR regarding my grievance.

For the record, my Director (despite claiming no participation in regard to an investigation which led to my termination) participated fully in the Unemployment Appeals Case with the TWC for Wrongful Termination (December 2020).

For the record, the young lady that initially cursed me out on March 10th 2020 never received any disciplinary action and was PROMOTED to my position upon my termination.

All above are just the FACTS.

In conclusion, I kept my mouth shut.  I adhered to "chain of command" communication policy.  I did not speak to staff regarding my case.  I waited patiently for the parties I requested and gathered my evidence in a folder in my locker.

Again, I would like to ask Methodist:

WHAT SHOULD I HAVE DONE DIFFERENTLY?

**Charge 1:  Wrongful Termination <u>due to Retaliation</u>; Charge 2: <u>Discrimination</u>**

Section 161.134 (statues.capitol.texas.gov) states that: RETALIATION AGAINST EMPLOYEES PROHIBITED

(a) A hospital, mental health facility or treatment facility may not suspend or terminate the employment of or discipline or otherwise discriminate against an employee for reporting to the employee's supervisor… a violation of law, including this chapter, a rule adopted under this chapter or a rule of another agency,

(b) A hospital… that violates subsection (a) is liable to the discriminated person

(c) A plaintiff who prevails in a suit under this section may recover actual damages, including damages for mental anguish even if an injury other than mental anguish is not shown.

(d) In addition to an award under subsection (c) a plaintiff who prevails in a suit under this section may recover exemplary damages and reasonable attorney fees.

(e) In addition to amounts recovered under subsections (c) and (d), a plaintiff is entitled to, if applicable:
1. Reinstatement in the plaintiff's former position;
2. Compensation for lost wages; and
3. Reinstatement of lost fringe benefits or seniority rights.

(f) A plaintiff suing under this section has the burden of proof, EXCEPT that it is a rebuttable presumption that the plaintiff's employment was suspended or terminated, or that the employee was disciplined or discriminated against, for making a report related to a violation if the suspension, termination, discipline, or discrimination occurs BEFORE the 60th day AFTER the date on which the plaintiff MADE A REPORT IN GOOD FAITH.

(I was fired 24 days after my initial claim of discrimination/workplace violence and gender bias.)

**The Fair Labor Standards Act (FLSA)**
Section 15(a)(3) of the FLSA states that it is a violation for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

Employees are protected regardless of whether the complaint is made orally or in writing.  Complaints made to the Wage and Hour Division are protected and most courts have ruled that INTERNAL COMPLAINTS TO AN EMPLOYER ARE ALSO PROTECTED.

**Requirements for a Retaliation Complaint**
**Protected Activity**
**Employer Adverse Action**

Texas Labor Code Chapter 21, Title VII of the Civil Rights Act protect individuals from retaliation.  An employer MAY NOT fire, demote, harass or otherwise retaliate against an individual for submitting a complaint of discrimination, participating in a discrimination proceeding or otherwise opposing discrimination.  The law applies to private employers with 15 or more employees and to all state and local governmental entities no matter how many employees they have.

**Requirements for a Retaliation Complaint**
Your retaliation discrimination complaint must show that you engaged in a protected activity, your employer took an adverse action and there was a direct connection between the protected activity and the adverse action.

**What is a Protected Activity**
Protected activities include submitting, assisting with or participating in the investigation of an employment discrimination complaint based on race, color, national origin, religion, **SEX**, age or disability.

**Employer Adverse Action**
An adverse action is when an employer tries to stop someone from participating in a protected activity.  Examples of adverse actions include:

- Termination
- Refusal to hire
- Denial of promotion
- Threats
- Unjustified negative evaluations or references

By sending my Director an email on March 17th 2020 detailing a long history of harassment, discrimination, threats and workplace violence, I believe I presented a strong case for Wrongful Termination due to retaliation and discrimination.

# Summary of events

(March 10th 2020 – April 10th 2020)

On March 10th 2020, upon arriving to work I, Willie HavMmeri, experienced an event that compelled me to file a grievance with my employer.

This grievance was a formal complaint filed with my immediate supervisor on March 17th 2020.
{See exhibit 1 below}

On March 29th 2020 (a Sunday) V. Marks (Lead Investigator) began an investigation which led to my termination for manipulation of financial documents.  (I only became aware of this start date during the TWC Unemployment Appeal Case in December of 2020).

On April 7th 2020, I was called on my hospital issued phone by my Director (R.Pegram) and told the parties I requested weeks earlier were ready to meet with me and to head down to Human Resources to begin the investigation into my grievance.  Upon arriving at HR at 1300 on April 7th, I was met by the Director of HR, V. Marks, along with my HR Rep (P. Aguilar).  After inquiring as to why I wasn't granted an audience with my Director's supervisor (A. Herrera), I was told by V. Marks that she would be investigating my claims and to have faith in her to due a thorough job.  I explained my position on the workplace violence I experienced on March 10th 2020 and informed V. Marks that it was simply the latest occurrence in a long and storied history of similar circumstances in my immediate work environment.  V. Marks promised that she would THEN meet with the parties involved, investigate my claims of 3 workers working in a 2 person work space and wrap up her investigation, no later than 3 days from this April 7th 2020 start date.  This confused me because it was only 3 days away at the time but I took her at her word and trusted in her professionalism with the process.

On April 10th 2020, I was summoned to my place of employment being told I would hear the results of the investigation into my grievance only to find out that I, in fact, was the subject of a covert investigation and subsequently fired for stealing time.
{See exhibit 2 below}

While unaware that I was in the process of being fired, I gave irrefutable evidence in person to explain that the allegations against me for stealing time (manipulation of financial documents) was false OR AT THE VERY LEAST, required further investigation.
{See exhibit 2 below}

Despite my evidence, Methodist Health Systems (MHS) pressured me to sign a pre-written termination letter with no representation and would not allow me to return to my workstation and retrieve a folder with all my evidence.  A week later, post termination, I was summoned to Human Resources to retrieve the contents of my locker and seating area.  My evidence folder was missing from my box of belongings.


# MHS Policy Violations

### Policy on workplace violence/ Disruptive Practitioner
{See exhibit 3 below – marked 7.5.2}

Methodist policy on workplace violence by an employee (referred to in policy as a "Disruptive Practitioner") states that threatening or abusive language, actions or gestures along with profanity, harassment and degrading/demeaning comments regarding a person or the hospital are actions that require correction/discipline.

I reported in my initial complaint persistent workplace violence as examples of my director and staff engaging in threats, gossip/slander, profanity laced tantrums as well as my director repeatedly threatening to fire me in the presence of staff.

**Policy on Investigating an employee's claim of workplace misconduct against a supervisor or director**
{See exhibit 3 below – marked 7.5.3}

Methodist policy states that an employee of the hospital who observes or is subjected to conduct of a disruptive practitioner shall immediately notify their supervisor (in my case, my Department Director – R. Pegram), Human Resources, Medical Staff Officer *or* the Vice President (in my case Vice President of Nursing and direct boss for my director, a man named Arturo Herrera, whom I asked to lead my investigation into my grievance).

Not only did I not receive the Vice President with whom I asked to lead the investigation into my claims, the person chosen to investigate my claim by my director (who was the primary subject of my initial grievance) was engaging in a covert investigation into me and had met, on record, with several of the staff in my department to gather evidence and statements to terminate my employment before I was sat down to discuss my claims against the department.

**Policy on documenting an employee's grievance (Incident Report)**
{See exhibit 3 below marked (2) under "Reporting the Incident" 7.5.3.1}

Methodist policy states that: If unable to resolve through communication, request that the individual reporting the incident document it in writing by completing the *Medical Staff Incident Report*.  The Incident Report must be signed by the complainant.

There is no Incident Report because the Director who interviewed me on my claims (V. Marks) did not suggest I document our exchange.  There is no Incident Report of my complaint which is a clear violation of Methodist Policy on such exchanges when reporting workplace violence.

**Policy on whistleblower protection / retaliation**
{See exhibit 4 below}

Methodist policy on Fraud and Abuse states:  Methodist Health System takes health care fraud and abuse very seriously.  It is Methodist's policy to provide information to all employees, contractors, and agents about the federal and state false claims laws, penalties available under these laws, and *the whistleblower protections available* under these laws.

Methodist failed to inform me of these whistleblower protections nor did Methodist provide me (the complainant) with any such protections from retaliation.

At this point in the contesting of my wrongful termination suit, it should be obvious to the court that Methodist maintains the position that my grievances did not deserve such protections, ignoring my initial complaint and still maintaining that my termination was justified.

I would like to take a second to state, for this record, that with the evidence of my initial grievance (see exhibit 1) and the timing of my termination, this is clearly retaliatory in nature and the attempt by powerful directors in positions of authority to silence me before I could put an Incident Report on record with the company.

**Policy on suspension, pending investigation and review**
{See exhibit 5 below}

Methodist policy on Suspension, Pending Investigation and Review states:  Employees believed to have engaged in conduct warranting termination of employment are placed on suspension pending investigation and review.  Not to be confused with a disciplinary suspension, the investigative suspension allows management a reasonable period of time to investigate the alleged infraction and review with the appropriate Medical Officers or designee, prior to taking disciplinary action. If after full consideration of the matter, disciplinary action is not taken, the employee will be **\*immediately returned to work\* without loss of pay due to the investigative suspension.**

This policy must be examined two (2) ways.

1. Renee Pegram (Director of Cardiology, my direct boss) was told that I believed she openly fostered a toxic work environment which gave preferential treatment to several women in the form of additional hours, additional shifts under the guise of "personal assistant", a lack of disciplinary actions for women who engaged in workplace violence and that she herself did similar actions deserving discipline such as, taunting, bullying and threats of termination usually in the presence of the female staff towards me.

   I asked R. Pegram to speak with her immediate supervisor Arturo Herrera (VP of Nursing) regarding my complaint.  This audience was never granted.  Instead, I was granted an audience with Val Marks (Director of Human Resources) and Renee Pegram was never SUSPENDED, PENDING INVESTIGATION AND REVIEW, as MHS Policy dictates.

   By R. Pegram remaining directly involved and still in the work environment, she actively participated in my termination.  R. Pegram summoned me to HR on April 7th 2020 to speak with V. Marks regarding my claims.  I would like to note again, I did not ask for V. Marks, I asked for R. Pegram's immediate boss.  V. Marks met with me on April 7th 2020 and did not inform me that I was being actively investigated at the same time.  (See Exhibit 7)

   (Additional evidence of a simultaneous investigation seeking grounds to terminate my employment can, and will, be provided as the case moves forward.)

   V. Marks never asked me to email her a statement.  I personally took her business card off her desk and took it upon myself to send her a follow up email with further details into my grievance because, while she was extremely polite during our sit down, she was quite dismissive and wanted to focus solely on the March 7th 2020 instance of workplace violence and ignore the Director's involvement in the circumstances that created the unfortunate confrontation.

If I did not take V. Marks' card off her desk, I would not have any official position on record and she never asked me to send her one.

I believe that if R. Pegram was removed from the workplace while an investigation into my claims were conducted, I would still have my job and Methodist would not be in this position today.  I believe that had the Directors in question adhered to policy, I would have been protected and not vilified for having the courage to speak out.  R. Pegram participated in the Texas Workforce Commission's Unemployment Appeal Hearing, despite maintaining she was not involved in the investigation which led to my termination.

2.  I, Willie HavMmeri, was not suspended pending investigation and review by the policy MHS had in place.

While going over MHS policy after my unceremonious and rather humiliating departure, under the policy regarding "immediately terminable offenses" it is listed that Falsification of Financial Documents is, in fact, one such offense.  For the record, I would like to state that MHS has never proven that I falsified or manipulated any financial documents while clocking in or out from work.  The only financial questions asked by MHS during their clocking system was an automated inquiry "Did you receive a lunch break today, type 1 for yes, 2 for no."  (To which I always answered "Yes", as seen in their evidence against me marked "Exhibit 9" below)

My argument is, first, the employer must prove such an offense has taken place that warrants a permanent removal from the workplace.  Second, while the employer investigates said offenses, I must be informed of the investigation, allowed to give evidence to my innocence and suspended from the workplace while the claims are investigated.

**Wallet Thief Example (immediately terminable offense)**

As an example of this, an "immediately terminable offense" would be stealing a wallet from a patient.  While this is grounds for immediate termination of employment, the employer must FIRST inform the suspected wallet thief that they will be removed from the work environment while they are being investigated and state why they will be investigated.  The suspected wallet thief can then give an account of their position on the matter so that the investigators can move forward with all necessary accounts of the potential offense.

The suspected wallet thief, after being informed of the charges against them and giving their account of their position, would be removed from the workplace, as to not tamper with the investigation nor have the ability to intimidate/manipulate witnesses.

Should the suspected wallet thief inform the investigators that the wallet was placed under the patient's mattress, being suspended pending an investigation, the investigators would have the unobstructed ability to verify whether the information given was true or false without interference by the suspected individual.  If it is now proven that the suspected wallet thief in fact placed the wallet under the patient's mattress, the vindicated employee is returned to work

with full pay for time missed during the investigative process.

**Continuation of policy regarding suspension, pending investigation and review**

Had R. Pegram been removed from the workplace according to MHS Policy on suspension, pending investigation and review, such policy would have protected me from retaliation and any covert investigations to terminate my employment without a resolution to my grievance.

I, Willie Lee HavMmeri, did not find out I was being investigated for stealing time until the day of my termination and the letter was pre-written.  (See exhibit 2 below).  This is a clear violation of MHS policy on this matter.  Furthermore, having given clear explanations as to my accounts of the terminable offenses levied against me on the day of termination (April 10th 2020), I should have been afforded the opportunity to be suspended, pending a thorough investigation while the new information I gave was investigated.

# Wrongful Termination

### MHS Evidence of grounds for termination (presented on April 10th 2020)

**Disclaimer:**  I would like to state that it is rather impossible given my position for me to effectively "steal time" in the manner in question.  The nature of my job (EKG/Stress Tech) was that I had to ALWAYS be ready at a moment's notice to perform cardiac procedures that were detrimental to patient health and safety.  As an example, a STAT heart procedure (immediate medical procedure and one of my responsibilities) had to be performed in no longer than 10 minutes after ordering.  A "Code Blue" (cardiac emergency in the hospital) could happen at any given time in any given location of the various hospital buildings (including the hospital gym) and required immediate intervention (also one of my primary responsibilities).

With that said, there is NO WAY I could leave my work environment and either go home (30-minute drive away) nor be inaccessible with such an important patient care responsibility, as I was the only person who could do my job at any given time.

I had a work phone (which only worked on the hospital grounds) and a work pager (for Code Blues and STAT procedures) and could never be more than 10 minutes away from any given patient on the MHS Campus.

For the record, before my termination on April 10th 2020, I had never been disciplined nor accused of being late or absent from providing patient care in my job role.

### a. Observed at home while on the clock March 31st 2020

I showed clear and irrefutable evidence that I did not go home as reported on my termination letter on the day of March 31st 2020 while continuing to be on the work clock.  Methodist presented me with an 8x10 print out picture of my offense, complete with the social media caption.  Since the date was so close to my termination, I showed the HR Directors (V. Marks and W. Wilson) the unedited picture in my phone, which they both verified was the photo in

question.  I then showed them the meta data on the photo, complete with the actual date it was taken and informed them I simply posted the picture on my social media **while I was at work**. The evidence has been so irrefutable that in the evidence packets presented by MHS legal teams for the Texas Workforce Commission (TWC) and the EEOC, Methodist has abandoned their social media picture evidence which was presented on the day of my termination as proof.

{Note: Despite no new evidence to support this claim, MHS has maintained this claim as justified and grounds for termination.}

### b. Frequenting the hospital gym without Director's knowledge

I maintain that I only frequented the hospital's gym (Folsom Fitness Center) on my breaks and lunches, which were taken at my own discretion and was known throughout my department by staff and my immediate supervisor, Director R. Pegram.  I had a membership at the hospital gym for 5 years prior to my termination and had openly used the gym on breaks and lunches the entire 5 years with several directors, supervisors and staff coworkers being fully aware.  While MHS Acting Lead Investigator (V. Marks) maintains that the evidence shows I was observed in the hospital gym over an hour, each offense listed, no evidence has ever been shown to support their claim.

Furthermore, the TWC determined that according to Texas Employment Law (See.  Exhibit 6 below), even if I as an employee was guilty of the offenses levied against me for frequenting the hospital gym, too much time had passed between the offenses for them to be a sufficient cause for termination of employment.  (Offenses listed on termination letter were from October 2019 until January/February 2020).  I was fired on April 10th 2020.

The TWC mediator further stated in her position statement to reverse the unemployment denial that, based on the evidence, the timing of my initial grievance and the dates associated with the investigation that led to my termination, it would be reasonable to assume that there were more factors that led to my termination than what was alleged on my termination letter and presented as evidence to back up the claims.  (Again, see Exhibit 6)

MHS did not appeal the decision.

## MHS Investigation which led to my termination

(March 29th 2020 until April 10th 2020)

Acting Lead Investigator (V. Marks) stated on record to the TWC (Audio hearing evidence to be presented at a later date) that she started her investigation which led to my termination on March 29th 2020.

Let the record show that March 29th 2020 was a Sunday, a day V. Marks does not regularly work.

V. Marks received an email from the employee I accused in my initial grievance of the workplace violence on March 29th 2020 (a Sunday).

At the time, I had never met V. Marks, the investigator, nor had I access to her work email address.  I was not even made aware that she would be leading any investigation, while I was

the party who reported the workplace violence to my immediate supervisor, Director R. Pegram (Evidence 1 below).

Evidence shows that Acting Investigator V. Marks inquired with the hospital's gym staff (Folsom Fitness Center) about my times badging into the gym on April 3rd 2020.  (Evidence 7 below).  I had still never met nor heard of V. Marks at this time.

All character witness statements from my work department were taken along with emails being sent to V. Marks BEFORE anyone sat down to discuss my allegations against the department. (evidence to be presented later or at the judge's request for proof before trial).

I maintain that no one talked to me about my version of the workplace violence until April 7th 2020, following R. Pegram summoning me to HR to meet with the parties I requested to lead my investigation.  This is evidenced by my follow up email to V. Marks on April 7th 2020 subjected "Workplace/Gender Discrimination" (Evidence 8 below) which specifically asked that no women in my work environment be disciplined and that we all receive additional training or that I be reassigned to another area for a peaceful resolution of the issues I was facing regarding bullying, gossip, being cursed out and threatened repeatedly for termination.

In my follow up email (Exhibit 8), it is clear that I had no idea I was the subject of an investigation for effectively stealing time and had I known, I would have presented the evidence I presented on my termination date at that very time.

# My Conclusion

It is clear, to me, that over the course of 31 days (March 10th 2020 until April 10th 2020) after experiencing workplace violence and reporting it to my immediate supervisor as a long history of toxic behavior (with herself included), I was in turn investigated and subsequently fired for offenses that I refuted and still refute till this very day.

I followed company policy regarding "chain of command" and waited patiently from the time of my initial grievance until it's conclusion could be reached to see justice administered.

For the matters of this case, I challenge Methodist and its legal team to produce an Incident Report with my signature regarding my initial grievance on March 17th 2020 because this was required, according to policy and I personally know there is no such Incident Report.

I believe myself to be a WHISTLEBLOWER with the federal and state protections associated with such a precarious position.  I tried to expose **DISCRIMINATION BASED ON SEX/GENDER** and was ultimately fired on the testimonies of the very people I sought to expose.  Imagine that.

I attempted to blow the whistle on shady financial practices in the Cardiology Department regarding maintaining 3 workers in a 2 person workspace and the allotment of additional hours based on gender which is textbook Gender Discrimination.

I believe that because neither my Director nor myself were suspended, pending investigation and review, that BOTH investigations were subsequently tainted.  My investigation into my Director was

tainted because she never allowed me to speak with the parties I requested (my Director handpicked the Lead Investigator V. Marks) and the investigation into the terminable offenses levied at me was tainted because I was never made aware of the investigation and never given a chance to formally refute the charges.

Because of ALL LISTED ABOVE and the EVIDENCE BELOW:

I believe my cause is JUST and seek SUBSTANTIAL compensation for my loss of wages, loss of health insurance, humiliation, defamation of character, mental anguish, pain and suffering and a litany of very unfortunate circumstances that I have pleaded with MHS repeatedly over the last 2 and a half years to help me resolve due to my lack of the ability to earn and my removal from the company.

After all, who would want to hire a man that's been fired for stealing time and now frightened to work around women?

I am armed with 100s of pages of documents.

I have over 5 hours of audio from V. Marks, R. Pegram, W. Wilson and myself originating from MHS depositions during the Texas Workforce Commission Unemployment Appeal Hearing.

I am preparing to request all my email history from the time employed with MHS, which along with my 100s of pages of documents and 5 hours of audio depositions will completely exonerate me.

Thank you to all in advance who must read these passionate rambles of a broken man…

Peace and love to ALL parties involved and may justice prevail.


Respectfully submitted,

By: _____/s/ Willie HavMmeri_____

Willie Lee HavMmeri, self-represented "Pro se"
godcolored@gmail.com
(214) 600-6207

Willie Lee HavMmeri vs Methodist Hospital of Dallas  Case No. 3:22-cv-00594-E-BT

**Certificate of Conference**

I would like to state that I did in fact contact MHS Legal Rep (J. Barcus) regarding a resolution to this matter outside of the confines of court through mediation and settlement.  Mr. Barcus was very courteous in explaining to me his intentions for filing a more definitive statement and I would like to formally apologize for my lack of follow up, as I was a bit intimidated (not being a legal expert) and did not want to say or send the wrong message.  Again, I offer Mr. Barcus my apologies, it was not my intentions to leave his request unanswered.

I would also like to state that I have taken it upon myself to contact MHS Legal Rep (J. Barcus) regarding 5 particular orders that I was preparing to submit to the court for his review and consideration beforehand.  The date of the email contacting Mr. Barcus was October 6th 2022 and the PDF was entitled "What was my Grievance".  My email was not replied to.  I understand why that was the case.  On the day I went to court to file this petition for 5 orders, I learned that the judge has approved his request for a more definitive statement (which I have addressed above).  I would like to inform all parties that I will send in those potential orders for the court's consideration shortly after this document is submitted to the records by the clerks.


Submitted by,   /s/ Willie HavMmeri

## Exhibit 1 (Marked Article 1, pages 1-3)

Article 1 Case no 2624641
page 1

**Gmail** - formal complaint regarding working environment

**formal complaint regarding working environment**
4 messages

Harris, Will L <WillHarris@mhd.com>                                          Tue, Mar 17, 2020 at 1:09 PM
To: "Pegram, Renee" <ReneePegram@mhd.com>
Cc: "willielcoharris@gmail.com" <willielcoharris@gmail.com>

Hello Renee,

It took me a week of going back and forth debating this subject in my mind and without to ignore the glaring disrespect or provide some context and a voice to my concerns.

I have a few issues. Really, an issue within an issue.

While what I'm about to tell you involves a particular employee, my issue is not actually with the employee but rather the working environment which fosters my concerns.

Last Tuesday (March 10th 2020) I arrived at work to a co-worker (Natasha) sitting at my desk and using the computer. No big deal. As I come in the door to punch in, Natasha informed me that Nuclear Medicine had called and I was needed for a stress test. With Natasha being in our EKG department at that moment and Pat being on the floor, I asked her why she didn't go down stairs and hook the patient up. This was said in jest and I take responsibility for that. Maybe it was too early in the morning to ask such a question. Who knows.

Natasha's reply was "I'm not working in EKG, I'm working with Renee today" to which I replied "Oh, well... you're sitting at my desk in the EKG department so I didn't know". This is where the conversation took a turn for the worse.

"Well, this ain't your desk, it belongs to Methodist and I can sit where I want."

"But Natasha, if you're working with Renee, then why are you in here? There's only space for 2 people and you sitting in the EKG department. Why wouldn't you use Pat's computer or sit at the front desk?"

"YOU CAN'T TELL ME WHERE THE FU*K I CAN SIT! STOP FU*KIN TALKIN TO ME! I DON'T WANNA HEAR THAT SH*T MORNING"

"But Natasha, you don't see Budd or Donnie G sitting in here... I wouldn't go sit in Echo and take their work stations to kill time and-"

"I SAID I DON'T WANNA HEAR IT!"

---

Article 1 Page 2

**Gmail** - formal complaint regarding working environment

At that moment Pat came in and I changed the subject by talking to pat and greeting her good morning. I consider it a non issue. Upon trying to speak to Natasha for the remainder of the day, seeing her in the hallways, at the front desk, etc, she was clearly still pissed off and proceeded to ignore me. Again, no big deal.

By the end of her shift she came in to the EKG department to use Pat's computer (pat had gone for the day) and later punch out and go home. We again talked about the morning mishap and upon hearing anything she didn't agree with, she wanted the conversation shut down. She started the conversation by telling me I must have woke up on the wrong side of the bed that morning and that I was acting like a "female" during the conversation. She mocked my delivery and speaking in a nasally effeminate way when recalling our conversation and I actually found it comical, as well as disingenuous.

We ended the day with her punching the clock and both agreeing to drop the issue. Still... I feel it is worth addressing with you, our director.

My issue(s) is not that we couldn't see eye to eye on matters affecting job performance or assigned areas, again, I have an issue within an issue.

Point one is that going from Latoya to Natasha with what essentially is a "utility/miscellaneous tech" operating freely in our department with no clearly defined role has been frustrating and problematic. When Latoya was in our department working on every Tuesday, we essentially had 3 workers for a 2 person job. Sometimes she would assist Pat with EKGs and give Pat a lunch and other times she would work with you on miscellaneous task you assign for her and still other times she would get pulled to PDU to work with their staff. Again, with no definable role we often had to make due with computers, workload and responsibilities.

With Natasha, we run into the same issue where she's clearly present at work, yet, uses the EKG department as a default work area when no work is assigned. Usually this wouldn't be that big of a problem because once you have a conversation about work expectations for the day, we can all further understand what role this utility tech will be in for that given day. This is where the "issue within the issue" comes in to play. The problem I have is when this communication breaks down and tempers flare, I don't deserve to be cursed out for it. I don't deserve to be called "female" for voicing concerns. I shouldn't feel threatened or fearful of false narratives when doing my job.

As a large black man, I am surprisingly at a disadvantage when verbal spats boil over in a department designed for one on one conversations and interactions such as the EKG department. This is one of many instances where I've been cursed out or "told off" in the department by our female staff and have no outlet to get the behavior addressed.

A few years ago, Mary stood over me and cursed me out wagging her finger in my face because I didn't complete a infant EKG for her. I had to stand up, put my hands over my head and walk out

---

Article 1 Page 3

**Gmail** - formal complaint regarding working environment

the department sliding sideways with my back against the walls so as not to remotely wanting to do a position to appear threatening. Once called me a "Lazy Nigga" for no longer wanting to do a stack of EKGs she couldn't get to before her lunch breaks— every day. You yourself, Renee, have reprimanded me for bragging to staff about going home early (within ear shot of you) to which you threatened to fire me in front of said staff. "Watch yourself Will... you gonna get yourself fired." to which I replied "Well, FIRE ME THEN" (This was also a day where we had an "extra" utility tech in the EKG department. Of course in that moment, I had to concede and walk back my comments but I made up my mind then and there that this environment is toxic for me and I would have to leave the department at some point.

I'm faced with a dilemma of trying to fight emotion with logic and sadly the emotional ones seem to have all the advantages here. So for clarity and summary, my issue and the issue within the issue is that we have 3 people doing a 2 person job. To have any conversation to which I don't concede to the narrative of my female coworkers is to be cursed out, threatened with termination and labeled "feminine" which, again is comical to me.

Ask yourself what would happen if I stood up to a female coworker 100 pounds lighter than me, wagging my finger and shouting profanities? Ask yourself what would happen if instead of getting called a "lazy nigga" I called the coworker in question an "old cripple"? Ask yourself what would be the narrative if I matched profanity laced, emotional dialogue with a female coworker? Imagine if I didn't apologize to my boss for HER threatening to fire me? In any of those scenarios would I still have a job??? Would not security be escorting me out the building? If I engaged in such behavior would it not be deemed "toxic"?

In closing, as with each instance I described earlier, after the initial blow up and emotional outburst, the next week, all is well and it never happened. Natasha and I are working together fine today and we are both polite and as cordial as what could be expected. Still, I can't help but think what would be the case if I "flew off the handle/showed my ass" like many of the women in our department have demonstrated they are capable of.

For the record, EACH YEAR, I am either first or second in EKGs completed despite working the fewest hours of any full time worker in our department. I do my job the fastest and most efficient and I'm universally loved outside of the EKG room. Also, my blood pressure is only high at the jobsite (220s/130s). At home and at the doctor's office, my blood pressure is perfect. So much so that my doctor swears I'm seeking medication for no reason. I've concluded that maybe it's my work environment. This is truly why I'm leaving.

************************************

This electronic transmission contains information from Methodist Health System and should be considered confidential and privileged. The information contained in the above message is intended only for the use of the individual(s) and entity(ies) named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of this information is prohibited. If you receive this transmission in error, please notify the sender immediately by return e-mail. Methodist Health System, its constituents and affiliates hereby claim all applicable privileges related to the transmission of this communication.

Exhibit 2 (Methodist Termination Letter, with evidence included with edit)



Exhibit 3 (Marked on document as "Article 11 & Article 12")



Exhibit 4 (Marked Fraud and Abuse Policy)

Rev 7/2016

## FRAUD AND ABUSE POLICY

Methodist Health System takes health care fraud and abuse very seriously. It is Methodist's policy to provide information to all employees, contractors, and agents about the federal and state false claims laws, penalties available under these laws, and the whistleblower protections available under these laws. Because Methodist and each employee, contractor, and agent of Methodist can be liable under these laws, Methodist seeks to impress upon each employee the importance of complying with and following the requirements of these laws. Methodist Policy 108, Detecting Fraud and Abuse and an Overview of the Federal and State False Claims Acts, sets forth Methodist's existing procedures for preventing and detecting fraud, waste, and abuse and presents an overview of the Federal Civil False Claims Act, the Program Fraud Civil Remedies Act, applicable state laws, and whistleblower protections.

Please refer to HR 108 (Detecting Fraud and Abuse and an Overview of the Federal and State False Claims Acts) policy for detailed information. It can also be viewed on the Methodist intranet site in the Document Library.

Exhibit 5 (Marked 34-A Performance Conduct)

34 - A

**Performance Conduct**
**Page 3 of 3**

HR 347

N. Misrepresentation of any documentation/time record, includes fraudulent acts such as clocking in before parking vehicle; being clocked in/out by someone other than yourself; clocking in/out for someone other than yourself
O. Use of profanity **within** earshot of a patient or guests
P. Fraternization (see HR 252)

**3. Suspension, Pending Investigation and Review**
Employees believed to have engaged in conduct warranting termination of employment are placed on suspension pending investigation and review. Not to be confused with a disciplinary suspension, the *investigative* suspension allows management a reasonable period of time to investigate the alleged infraction and review with the appropriate hospital/division President/Vice President and Human Resources Director or designee, prior to taking disciplinary action. If after full consideration of the matter, disciplinary action is not taken, the employee will be immediately returned to work without loss of pay due to the investigative suspension.

**Exhibit 6 (the entire exhibit Starting with Appeal No. 243-CA-76)**

The following decisions have been adopted as a precedent by the Commission in Section MC 385.00 of the Appeals Policy and Precedent Manual.

Appeal No. 243-CA-76. Where the most recent act of misconduct on a claimant's part alleged by the employer was shown to have occurred three months prior to the claimant's discharge, such act or omission, even if proved by a preponderance of the evidence, will not support a finding of misconduct with the work for which the claimant was discharged, because it was too remote in time from the discharge.

Appeal No. 97-008947-10-082097. As a rule, misconduct will not be found where the precipitating incident is too remote in time from the date of the work separation. This general

---

**TEXAS WORKFORCE COMMISSION** Appeal Tribunal Decision          Appeal No.:   2624641-1-2
                                                                  Page No:       5

rule does not apply, however, if the delay is caused by established procedures designed to protect the worker from possibly erroneous separation decisions. Here, the claimant was discharged four months after the precipitating incident. During that time, however, the employer conducted an internal investigation, reviewed the recommendation to terminate through the chain of command, and allowed the claimant to complete a pre-termination hearing procedure. HELD: Here, the delay caused by the employer's reasonable pre-termination procedures did not render the discharge too remote in time from the final incident. Discharged for misconduct connected with the last work.

Consistent with the precedents cited above, as the claimant was not discharged for these policy violations until April 10, 2020, the nexus between the misconduct and the grounds for termination are too attenuated to be the sole cause of his termination. The investigation into whether the claimant frequented areas outside of his designated work area only arose after he sent an email expressing his concerns about his supervisor and coworkers thus it is more probable than not that the claimant was discharged for other reasons not specified by the employer.  Given the remoteness of the policy violations, the timing of the investigation, and the lack of evidence and testimony regarding more recent policy violations prompting the claimant's discharge, the employer has not established by a preponderance of the evidence that the claimant was discharged for reasons that amount to misconduct connected with the work.  Therefore, the determination dated August 7, 2020, disqualifying the claimant under Section 207.044 of the Act is reversed.

Section 205.013 of the Act provides that at the end of each calendar quarter the Commission shall bill each reimbursing employer for an amount equal to the amount of the regular benefits plus one-half (1/2) of the amount of the extended benefits paid during such quarter which are attributable to service in the

Exhibit 7 (Marked 28-A)



Exhibit 8 (Marked "Article 3)



Exhibit 9: Only financial question is "did you have a lunch" and the answer was always "YES"



Exhibit 10: Picture of the 2 person workspace, my assigned workstation has the pictures of my family above on my locker and is stationed to the left)



Exhibit 11: proof I was not at home on March 31st 2020, as stated on my pre-written termination letter



Exhibit 12: Proof my Director was, in fact, aware that I frequented the Hospital Gym
(a point at which she denied on the TWC audio and is mentioned to be unaware of on my Termination Letter)



Exhibit 13: Unedited Termination Letter, front & back

(Despite my evidence of my innocence, I was told by V.Marks that I was observed at the Hospital Gym over an hour "EACH TIME" and my Director remained very much unaware that I ever used the gym over the years.  It has now been over 2 years since my termination and after numerous court proceedings, I have yet to see this evidence of being observed for over an hour from each occurrence.)